NORWOOD PAPER CO. v. COLUMBIA PAPER BAG CO. OF BALTIMORE
CITY.

(Circuit Court of Appeals, Fourth Circuit. February 7, 1911.)

No. 932.

1. SET-OFF AND COUNTERCLAIM (§ 59*)—RIGHT OF DEFENDANT TO JUDGMENT
FOR EXCESS—LAW OF MARYLAND.
    Code Pub. Gen. Laws 1904. Md. art. 75, §§ 12, 13, relating to set-off,
    does not authorize a defendant to recover an affirmative judgment against
    the plaintiff on a counterclaim for unliquidated damages for breach of
    the contract sued on.
    [Ed. Note.—For other cases, see Set-Off and Counterclaim, Cent. Dig.
    §§ 130–132; Dec. Dig. § 59.*]

2. SET-OFF AND COUNTERCLAIM (§ 35*)—UNLIQUIDATED DEMAND—DAMAGES
FOR NONDELIVERY OF GOODS.
    In an action to recover the price of goods delivered under a contract
    of sale, a counterclaim for nondelivery of goods according to the contract
    is one for unliquidated damages.
    [Ed. Note.—For other cases, see Set-Off and Counterclaim, Cent. Dig.
    §§ 58–64; Dec. Dig. § 35.*]

3. PLEADING (§ 411*)—RIGHT OF DEFENDANT TO JUDGMENT FOR EXCESS—
WAIVER OF OBJECTIONS.
    Under the law of Maryland, the failure of a plaintiff to demur to a
    plea of set-off is not a waiver of the right to object to recovery of an af-
    firmative judgment thereon, where the objection is taken before verdict
    by prayer for instructions.
    [Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1384, 1385;
    Dec. Dig. § 411.*]

4. SALES (§ 428*)—WARRANTIES—REMEDIES FOR BREACH—SET-OFF.
    A provision in a contract for the sale of paper to be used in making
    bags that "the said paper shall be substantially the same average quality
    as the samples attached to this contract" constituted an express warranty
    of quality, and, in an action to recover the price of paper delivered under
    the contract, the purchaser was entitled to recoup from the contract price
    the difference between the value of the paper as so warranted, and that
    actually delivered.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1214–1223; Dec.
    Dig. § 428.*]

5. SALES (§ 99*)—CONSTRUCTION OF CONTRACT—RIGHT OF CANCELLATION.
    Under a contract for the sale of 2,000 tons of paper, to be delivered
    during a year in substantially equal monthly installments, a provision
    giving the seller the right to cancel the contract if any amounts due
    thereunder should not be paid within 10 days after maturity did not
    give the seller such right when it was in default in deliveries, and the
    damages resulting from such defaults to the purchaser more than equaled
    the payments due for paper delivered.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. § 264; Dec. Dig. §
    99.*]

In Error to the Circuit Court of the United States for the District
of Maryland, at Baltimore.

Action at law by the Norwood Paper Company against the Colum-
bia Paper Bag Company of Baltimore City. Judgment for defendant,
and plaintiff brings error. Reversed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

William Reynolds, for plaintiff in error.

Edwin G. Baetjer, for defendant in error.

Before PRITCHARD, Circuit Judge, and McDOWELL and ROSE, District Judges.

ROSE, District Judge.  The Norwood Paper Company was the plaintiff below.  It will be called the "Paper Company."  The defendant was the Columbia Paper Bag Company.  It will be referred to as the "Bag Company."

The Paper Company is a New York corporation.  Its mills were in the northern part of that state.  The Bag Company was incorporated under the laws of Maryland.  Its factory was in Baltimore city. It there made bags in large quantities.  The Paper Company and the Bag Company agreed that during the year beginning June 30, 1906, the former would sell and deliver to the latter f. o. b. Baltimore 2,000 tons of bag paper.  The Bag Company promised to buy this paper. It was to pay for it the prices named in the written contract between the parties.  The contract declared that the "paper shall be of substantially the same average quality as the samples" attached.  From time to time the Bag Company was to specify the sizes and certain other particulars of the paper it wanted.  The court below construed the contract to require that approximately one-twelfth of the whole 2,000 tons, or, say, 166⅔ tons, should be delivered in each month. Payments were to be made in 30 days from the date of each invoice. The Paper Company reserved the right to cancel the contract if any payment was more than 10 days overdue.  The Paper Company did not declare upon the contract.  It sued for paper sold and delivered and for the price of seven car loads of paper which it said the Bag Company had bought and had wrongfully refused to take or pay for. The Bag Company, in addition to the general issue, filed a counterclaim in the form of a plea.  This counterclaim said that the Paper Company was indebted to the Bag Company in a sum greater than the latter's claim for money payable upon the common counts and upon a special count.  This special count set up the contract between the parties.  It charged that the Paper Company had wrongfully failed to deliver the quantity of paper called for by the contract.  The damage thereby done to the Bag Company was said to have been $17,000. At the trial the jury rendered a verdict for the Bag Company for $2,275.28.  Judgment against the Paper Company for that sum was given.

The Paper Company assigns five errors.  We shall consider them in the order in which it discusses them in its brief.

The first alleges the erroneous admission of certain testimony.  We need not consider it.  The subsequent course of the trial made the error, if there was one, harmless.

The second error assigned is that the court by its instruction permitted the jury to return a verdict against the plaintiff for what is said to be unliquidated damages.  The Paper Company says that in Maryland a defendant can never recover an affirmative judgment for such damages.  The claim and the counterclaim grew out of one contract.  All the evidence offered in support of the counterclaim was

admissible under the general issue plea to the claim. Had the Bag Company brought a separate suit instead of filing a counterclaim, no other or different evidence would have been introduced than was submitted. To have tried two suits instead of one would have taken twice as much time and would have cost twice as much money. In every other respect the result would presumably have been the same. If permitted by the laws of Maryland, there can be no question as to the practical good sense of the course taken by the learned trial judge. The Court of Appeals of Maryland does not appear ever to have had before it a case in which a defendant sought to recover a judgment against a plaintiff for unliquidated damages for breach of the contract upon which the plaintiff sued. It is therefore necessary to make a closer examination of elementary doctrines than under other circumstances would be either requisite or expedient. Both sides agree that at common law a defendant could not under any circumstances recover a judgment against a plaintiff for anything other than costs. To inquire why will serve no present purpose. The unwillingness of the clerks of the chancery to let two suits be tried for the price of one writ may have played its part. A defendant sued upon a contract was always at liberty to show, if he could, that the plaintiff had himself broken it. The damages which the defendant might prove he had suffered by reason of the plaintiff's breach could, however, be used only for the purpose of barring, reducing, discounting, or recouping what the plaintiff would have otherwise been entitled to recover. It made no difference whether the damages which the defendant so set up were liquidated or unliquidated. Either might be used as a shield, neither as a sword. 1 Chitty on Pleading, 595.

A defendant at law could not in any wise turn to account a claim he had against a plaintiff, unless that claim grew out of the transaction upon which the suit had been brought. A liquidated demand otherwise arising was in a court of law as useless as an unliquidated one. Under some circumstances, equity would aid a defendant with a claim against a plaintiff who was suing him at law upon another cause of action. 2 Story's Equity Jurisprudence, § 1438. In the absence of special circumstance, such as the insolvency or nonresidence of the plaintiff, chancery would not act unless the defendant's demand was liquidated. Waterman on Set-Off, 444; Smith v. Washington Gaslight Co., 31 Md. 18, 100 Am. Dec. 49; N. Chicago Rolling Mill Co. v. Ore & Steel Co., 152 U. S. 615, 14 Sup. Ct. 710, 38 L. Ed. 565. Practical expediency, as well as historical precedent, justified, if it did not require, the refusal of equity to permit a defendant to use every sort of claim he might see fit to set up. A principal sues his agent for moneys of the principal received by the agent and wrongfully converted to the latter's use. It is at least doubtful if either time would be saved or justice furthered by allowing the agent to counterclaim for damages for slanderous words spoken of him by the plaintiff. The equitable doctrine of set-off doubtless found its origin in the civil law. That law recognized the expediency of imposing some restriction upon the kind of extrinsic claims which a defendant might use. It required that such claims should be certain

and determined, actually due, in the same right and of the same kind as that of the plaintiff. 2 Story's Equity Jurisprudence, § 1441.

The civil law requirement that the claim should be certain and determined quite naturally in the English chancery took the form of the rule that it should be liquidated. The underlying idea and purpose of the requirement and the rule were the same. The practical difference was that the line between what were and what were not liquidated claims was far more arbitrary and technical at the common law than was the civil-law distinction between the claims which were certain and determined and those which were not. The first statutory changes took the form of letting a defendant have at law the relief which had formerly cost him a bill in chancery. The purpose of the earliest English statute of set-off was not primarily the simplification of legal procedure. The investigations of Gen. Oglethorpe into the condition of debtors' prisons had aroused an intense and wide-spread public indignation. The result was the Act of 2 George II, c. 22, for the relief of debtors with respect to the imprisonment of their persons. The first six sections made elaborate, if, as the result showed, somewhat ineffectual, provisions to protect unfortunate debtors against the extortions, the cruelties, and the neglects of their jailors. Then followed other sections which provided for the release of certain classes of debtors upon their surrendering their property and taking what came to be called the poor debtor's oath. The purpose of the thirteenth section was to keep out of jail a man who on the balance of accounts was not a debtor at all, but who, as the law had been, could be sent to prison merely because he had let the plaintiff sue him first. It declared, in substance, that, where there were mutual debts, they might be off-set against each other. The defendant might plead the debt due him in bar or give it in evidence under the general issue. If he took the latter course, he was required at the time of pleading to give notice of the particular sum or debt intended to be insisted on and upon what account it became due. This section of the act was explained and in some respects amended by the Act of 8 George II, chapter 24. Under these acts, it was held that the word "debt" was used in the technical sense of a liquidated demand. It followed that the statutes applied only to suits in which the claims were liquidated on both sides. It was ruled that, if a debt due the defendant was less than a debt due the plaintiff, the plaintiff should take judgment for the difference. If the plaintiff owed the defendant as much or more money than the defendant owed the plaintiff, the result was that the plaintiff was cast in costs. In no case could the defendant recover an affirmative judgment against the plaintiff. 1 Chitty on Pleading, 598; Hennell v. Fairlamb, 3 Esp. 104. The statutes above mentioned were never in force in Maryland. Kilty's Report on British Statutes. They are here spoken of because it is more than probable that the decisions under them had not a little influence upon the construction placed by the Maryland courts upon the provincial and state legislation as to set-off. The first Maryland enactment upon the subject was chapter 23 of the Acts of 1654. It was short and quaintly worded. It read:

"All lawful accompts produced and proved in court *(on)* the defendant's part shall hold play to the plaintiff's suit for debt and shall be satisfactory to his demands, except the said accompts be above nine months standing."

In the provincial acts of 1715 (chapter 29) and 1729 (chapter 20) are other provisions intended to protect defendants who had claims against the plaintiff. The seventh section of chapter 46 of the Acts of 1785 is still in substance in force. With an addition made in 1876, it now constitutes sections 12 and 13 of article 75 of the Code of Public General Laws. The act of 1785, like its predecessors of 1715 and 1729, related for the most part to matters of evidence. It provided an easy way by which instruments executed out of the state or accounts for goods sold by persons living elsewhere than in Maryland might be proved. In section 7 it declared that in case any suit should be brought on a judgment or sealed instrument, and the defendant shall have any demand or claim against the plaintiff upon a judgment or instrument under seal, or upon note, agreement, assumpsit, or account proved, as by this act allowed or otherwise according to law, the defendant shall be at liberty to file his account in bar or plead discount to the plaintiff's claim, and judgment shall be given for the plaintiff for the sum only which remains due after just discount made. In all cases of suits upon civil contracts, the defendant might file an account in bar or plead discount of any claim he might have against the plaintiff proved as aforesaid or otherwise proved according to law which may be of equal or superior nature to the plaintiff's claim and judgment shall be given as aforesaid.

The purport of the entire enactment and the language of this particular section as originally enacted have been set forth in some detail in order that we may form a better idea of the precise things which the General Assembly of 1785 had in mind. It might not be safe to say that the Legislature meant that the only claims which a defendant could use as set-offs under the seventh section were claims of the kind referred to in the preceding sections. It is, however, obvious that it was only such claims which the earlier portions of the act had called specially to the legislative attention. The evidence sections dealt with the manner of proving deeds, wills, bonds, bills, notes, or other instruments of writing which had subscribing witnesses and to give validity to which recording or registering was not necessary, and of proving open accounts for the payment or delivery of any money or the delivery or sale of any goods, wares, merchandise, chattels, effects whatsoever by any merchant or person carrying on commerce or using or carrying on any trade whatsoever by buying or selling or manufacturing for sale. The words "otherwise proved according to law" were probably not intended to extend the class of claims which could be used in off-set. The statute itself had already declared that the method of proof specified in it was not exclusive, and that any other recognized by law might be used. It is obvious that the claims based upon the instruments and accounts mentioned in the act would usually, if not always, be liquidated. However this may be, it is not contended that under the act as it originally stood, and as it remained for 90 years, a defendant was entitled to an affirmative judgment for anything

other than costs. For a great many years past it has been assumed that the set-offs which the act permitted to be used must be liquidated demands. 1 Poe on Pleading, § 613; Hearn v. Cullin, 54 Md. 542; Cumberland & Pennsylvania R. R. Co. v. Slack, 45 Md. 180.

It is true that in 1815 the Court of Appeals of Maryland seemed to favor a construction of the act which would have permitted unliquidated claims growing out of other transactions to be used in set-off. It did not, however, so decide. The facts did not require it. The case referred to was the Baltimore Insurance Company v. McFadon, 4 Har. & J. 31. That was an action upon an open policy of insurance. The plaintiff had to show that the event insured against had taken place and the value of the goods insured. The insurance company sought to use as an off-set certain overdue promissory notes of the insured held by them. It was objected that the plaintiff's claim was unliquidated, and that set-off could not be allowed in any case in which the claims on either side were not liquidated. Such had been the construction of the Statutes of George II, for in them the words "mutual debts" had been used. The Court of Appeals said:

"No reason can be urged why a person who has an uncertain claim should be permitted to recover from him who has a certain demand. If any difference ought to be made it should be in favor of that which is certain. * * * He ought not to be prevented, unless the act positively directs it. Recur to that act, and not a word is to be found on the subject of liquidated or unliquidated claims or debts of any description. * * * By a liberal and extensive construction of the act the object and policy of the law is advanced by enlarging the description of those claims against which discounts were to be admissible."

In subsequent cases, however, the Court of Appeals appears to have come around to the then prevailing English and American point of view as to the proper construction of set-off statutes.

In the case of Annan v. Houck, 4 Gill. (Md.) 330, 45 Am. Dec. 133, it was said that the court in the case of the Baltimore Insurance Co. v. McFadon, supra, had only decided that a liquidated claim which the defendant had against the plaintiff may be set-off against an unliquidated claim on which the suit was brought. In answer to the contention that the set-off statutes should receive a liberal construction, the court said:

"No doubt they are beneficial laws and it may be that the Legislature might make them more so, but it is the business of courts jus decere and not jus dare. If the law of set-off can be improved, let this be done by further legislation, not by misconstruction."

It must be borne in mind that, until the amendment of 1876, the question as to whether the statute permitted the use by the defendant of unliquidated claims could never arise except as to claims growing out of another transaction from that upon which the suit had been brought. No enactment was needed to give the defendant the right to recoup or discount any damage he had suffered by a breach of the contract upon which the plaintiff sued. That he had at common law. No one then thought the statute had anything to do with such cases. It was supposed to be intended to give the defendant a right which he otherwise had not. That right was to use as a defense a claim which

he had against the plaintiff arising out of another transaction. In 1785, and for many years afterwards, neither in England nor in this country, was there any statute, so far as we are aware, which authorized the defendant in a suit brought against him to make any use of a claim he might have against the plaintiff for unliquidated damages growing out of a transaction other than that upon which he had been sued. More than a third of a century ago the Legislature of Maryland amended the act of 1785 by providing, in substance, that a defendant might recover a judgment for any excess found to be due to him by the plaintiff on any claim which the statute had previously authorized him to use in bar or reduction of the plaintiff's claim. The language defining the claims which the defendant might use remained precisely as it was in the act of 1785, except that in the codification of 1860 the words "proved as by this act allowed or otherwise according to law" were omitted. The omission was probably due to the fact that the evidence sections of the early enactment were carried to other portions of the Code. The codifiers apparently had lost sight of the fact that those words may originally have had a significance which we have previously pointed out.

After the passage of the act of 1876 (chapter 398), if a defendant proved that upon claims which the previous act had authorized him to use the plaintiff owed him more money than he owed the plaintiff upon the claim upon which the plaintiff had brought suit, the defendant could recover a judgment for the excess. The new act had no other possible effect. Whether a defendant can recover an affirmative judgment for unliquidated damages suffered by him in consequence of the breach by the plaintiff of the contract, sued on depends upon the construction to be put upon the act of 1785 as amended by that of 1876.

The Bag Company says that it is true that the act of 1785 made no change in the common law so far as concerned the right of the defendant to use in his defense claims for damages, liquidated or unliquidated, arising out of the same transaction. It contends, however, that the act by its terms and intent declared such right and extended it to liquidated claims growing out of other transactions. So soon as the act of 1876 became law this declaration and extension, which for 90 years had served no practical purpose, the Bag Company argues became of great importance. The Paper Company in effect answers that the act of 1785 had nothing whatever to do with those classes of claims which a defendant at common law might have used in recoupment. If the Bag Company's construction of the statute is sound, it meant when enacted the same thing that it would have meant had it read:

"In any suit upon simple contract the defendant may file in bar or plead in discount any claim growing out of the same transaction and any liquidated claim growing out of a different transaction he may have against the plaintiff proved according to law which may be of equal or superior nature to the plaintiff's claim."

We do not feel that such a construction can possibly be given to the act of 1785. If, as the Maryland courts have held that act did not permit the defendant to use unliquidated claims growing out of

another transaction, we are constrained to hold the statute had no reference whatever to those unliquidated claims arising out of the same transaction which the common law permitted to be used by way of recoupment. If we are right in this, it follows that in the courts of Maryland a defendant may not now recover an affirmative judgment for unliquidated damages whether they grow out of the same or a different transaction from that upon which he has been sued. The act of 1876, as has been pointed out, in no wise altered the classes of claims which the defendant might use. It simply allowed him to use the old classes in a new way. If the Bag Company's counterclaim was for unliquidated damages, the Paper Company's second assignment of error was well taken.

The Bag Company offered evidence tending to show that it suffered damage to the amount of $4,849 by reason of the inferior quality of the paper actually received and used by it. We need not consider whether this claim was for liquidated or unliquidated damages. It is not mentioned in the Bag Company's counterclaim. It must therefore have been offered in evidence merely in recoupment of the Paper Company's demand. In Maryland a set-off or counterclaim must be specially pleaded. 1 Poe on Pleading, § 613.

The question, therefore, turns on whether the Bag Company's claim for damage suffered by it by reason of the Paper Company's breach of its contract to deliver the quantity of the paper called for by the contract is liquidated or unliquidated. The Bag Company offered evidence tending to show that there was strictly no market price for such paper; that it bought paper to make good the quantity which according to contract the Paper Company should have delivered and did not; and that it paid for the paper so purchased $7,712.55 more than it would have paid the Paper Company had the Paper Company delivered under the contract. The Bag Company strenuously contends that this sum is far more liquidated and certain than are many claims which the courts of Maryland have held to be liquidated. That may or may not be true. We express no opinion on the subject. The classic illustration of what is an unliquidated claim under the statutes of set-off is a claim for not delivering goods according to contract. 1 Chitty on Pleading, 599; N. Chicago Rolling Mill Co. v. St. Louis Ore & Steel Co., 152 U. S. 596, 14 Sup. Ct. 710, 38 L. Ed. 565; Charnley v. Sibley, 73 Fed. 980, 20 C. C. A. 157. It may well be that either a defendant should be allowed to recover an affirmative judgment for unliquidated damages suffered by him as a result of the plaintiff's breach of a contract upon which the plaintiff was sued, or that the line of demarcation between liquidated and unliquidated damages should be changed. Those are questions for the General Assembly of Maryland.

In reaching the conclusion that in Maryland a defendant may not recover an affirmative judgment for unliquidated damages, and that damages for the nondelivery of articles contracted to be delivered are liquidated, we have given some weight to the fact that no case in which such recovery has been asked has ever apparently been taken to the highest court of the state. The cases in which a defendant would have been entitled to such a judgment had the law permitted it must

have been both numerous and important. That the bar of Maryland has not supposed that it could be done is demonstrated by the fact that nobody appears ever to have tried to do it, convenient and desirable as it must often have seemed to be. For many centuries the opinion of Westminster Hall on matters of practice has been regarded as an authority only less persuasive than that of a decided case. The Bag Company says that the Paper Company did not demur to the set-off plea. It pleaded to it, and issues were joined thereon. From this the Bag Company argues that the Paper Company had waived its right to object to a recovery upon the set-off plea. No authority is cited for this proposition. At common law the failure to demur had no such effect as that claimed for it by the Bag Company. A motion in arrest of judgment could be made upon the same grounds for which a demurrer might have been interposed. The Maryland statute, which declares that "no judgment shall be arrested or set aside * * * for any other matter or cause which might have been subject of general demurrer to the declaration or other pleadings," has no application to a case in which before the verdict one of the parties has raised the objection by a prayer for instructions to the jury. Ward v. State, 111 Md. 528, 75 Atl. 116.

The Paper Company's third assignment of error is directed to the instruction given by the court to the jury that there was no evidence in the case from which they could find that the Paper Company was in fact unable at any time from causes beyond its control to supply the full quantity of bag paper ordered under the contract. This instruction was material because the contract contained a clause to the effect that:

"In case the manufacturer shall be unable at all times to make and supply said paper in consequence of strikes, fire, explosion, floods, war, the acts of God or the public enemy, or any cause beyond the control of either party, the manufacturer, after notice to the purchaser, shall not be liable to the purchaser for failure to supply said paper resulting from any of the causes during the period of inability."

In our view the record discloses no such evidence. It follows that the third assignment of error cannot be sustained.

The fourth assignment of error raised the question whether the court below was right in allowing the jury to deduct from the contract price of paper delivered under the contract and used by the Bag Company such sum as the jury might find to be the difference between the value of the paper actually delivered and the value of the paper of the kind and quality which by the contract the Paper Company undertook to deliver. The Paper Company says there was no express warranty of quality in the contract; that the reference to quality in the agreement was merely a description of the article to be delivered; that the Bag Company had the unquestioned right to reject any paper which was not of the quality described in the contract; that it had the opportunity to inspect the paper before using; that, if it did use the paper, it was bound to pay the contract price. We do not find it necessary to follow the learned counsel for the Paper Company in his examination of the cases which hold that in the absence of an express warranty the rule of law is as he states it to be.

In our judgment it would be difficult ever to give an express warranty, if the language employed by the parties here does not amount to one. The Paper Company over its own signature agrees that "the said paper shall be of substantially the same average quality as the samples attached to this contract." Here is a distinct undertaking and promise that the paper shall be of the quality of the sample. Nothing more is required. Crook v. B. & O. R. R. Co., 80 Md. 338, 30 Atl. 701.

The ruling of the court below attacked by the Paper Company's fourth assignment of error was right.

The remaining, or fifth, assignment of error, has relation to the instructions given by the court with reference to the Paper Company's claim that it rightfully canceled the contract. By the terms of the agreement between the parties the paper was to be paid for in cash in 30 days from the date of invoice, and it was provided that:

"In case the purchaser should have failed to pay any amounts due hereunder * * * within ten days after maturity the manufacturer may at its option cancel the contract and refuse to furnish any more paper hereunder."

On the 17th of May, 1907, the Paper Company wired the Bag Company:

"Your invoices due April 2 to 6, inclusive, are ten days overdue and unpaid. We hereby cancel contract and demand payment of all invoices forthwith in accordance with the contract."

The amount of the invoices referred to was $6,391.76. The court instructed the jury that, if at the time the Paper Company sent the telegram the Bag Company had failed to pay for 10 days after the maturity thereof the amount due upon any invoice of paper which had been shipped to it by the Paper Company over and above any proper deduction for deficiency in quality and delays in delivery, then the Paper Company had the right to cancel the contract. The court further instructed the jury that:

"If there was an invoice overdue and in default under the contract, the plaintiff had a right to cancel the contract, but, if there was only a portion due, I do not think he had. I do not think it could be split up in that way. If there was as much as one invoice overdue and in default, I think he had a right to cancel it and not otherwise."

The Paper Company points out three respects in which these instructions were wrong: First, in allowing a deduction from the face of the invoices for a deficiency in quality; secondly, in allowing a deduction for delays in delivery; and, thirdly, in instructing the jury that the Paper Company had no right to cancel the contract if there was only a portion of an invoice overdue and in default.

The objection to allowing the jury to take into account the deficiency in quality is the same as has already been disposed of in overruling the fourth assignment of error.

We do not think that there is any greater merit in the second objection. The Paper Company attempted to cancel the contract on the 17th of May when less than 1½ months remained of the year during which it had bound itself to deliver 2,000 tons of paper in approximately equal monthly installments, as the court below, with the ap-

parent consent of both parties, construed the contract. It had in fact only delivered 1,015 tons when it should have delivered some 1,750; that is to say, it had delivered 735 less tons than under the contract it should have delivered. There was evidence tending to show that the market price of paper on May 17, 1907, was $12.50 a ton greater than the price fixed by the contract. When the Paper Company attempted to cancel the contract, if that evidence was true, the Bag Company in truth and in right owed it nothing. The Paper Company's contention is that the Bag Company was bound to pay it promptly for every ton of paper delivered and had no right to withhold such payments because of the Paper Company's defaults in its deliveries. We know of no justification for this contention. The case of Baltimore City v. Schaub Bros., 96 Md. 534, 54 Atl. 106, relied on by the Paper Company, falls short of sustaining it.

As to the third objection, only a word need be said. The instruction given may very possibly be open to objection. It may be that if on the 17th of May, after making all deductions for deficiency in quality and delays in delivery, any sum owing by the Bag Company to the Paper Company had been more than ten days overdue, the Paper Company would have had the right to cancel the contract. It may be that it would have made no difference whether the sum due was all due on one invoice or on many, or whether it did or did not aggregate the amount of any one invoice. It is not necessary to pass on that question. The finding of the jury conclusively shows that, whether this instruction was right or wrong, it did the Paper Company no harm. The amount of the verdict demonstrates that in the opinion of the jury on the 17th of May, 1907, the Bag Company owed the Paper Company nothing.

Having reached the conclusion that the court below was in error in allowing the jury to return a verdict for damages in favor of the Bag Company, the judgment must be reversed.